IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Kayla B. Lowe, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 22-cv-3026 ) ) Hon. Jorge L. Alonso |
| City of Chicago, *et al.*, | ) ) |
| Defendants. | ) |

### MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Hugo Sanchez, Alex Aguas, and the City of Chicago's motion for summary judgment. ECF No. 108. For the reasons that follow, their motion is granted. Civil case terminated.

### Background

The following facts are taken from the parties' Local Rule 56 submissions and the documents cited therein and are undisputed or presented in the light most favorable to Lowe, the non-moving party.

Masjid Al Faroq, a Muslim religious organization, owns a building at 7233 South Kimbark Avenue in Chicago, Illinois, consisting of a first-floor and second-floor apartment. Plaintiff Kayla Lowe lived in the first-floor apartment with her grandfather, Wendell Hudson. Hudson initially lived in the apartment with Masjid's permission but was subsequently evicted from the apartment. Hudson was not removed from the apartment, however, due to a COVID-19 eviction moratorium and he continued to live in the apartment with Lowe.

On December 18, 2020, Chicago Police Officers Aguas and Sanchez responded to a call reporting a burglary at the property. While on their way to respond to the call, the Officers received

information that the suspect was on site, someone was moving inside the apartment, and that the break-in was by a neighbor.

When the Officers arrived, they met two individuals, Diarra Diaby and Alassane Soumare. Diaby informed the Officers that he was the landlord that had called the police, and Soumare informed the Officers he was housesitting for the second-floor tenant. The Officers did not ask either for documentary evidence that they were the landlord and housesitter. Diaby opened the initial door to the building. However, he was unable to open the second internal door leading to the hallway between the apartments, at which point Soumare told him that he would need a screwdriver to open that door. At that point, Hudson opened the second door and asked the police to arrest Diaby and Soumare for breaking into the apartment because they had no right to enter the building where they did not live.

Recognizing the conflicting stories, the Officers brought the three to the second-floor apartment to discuss the situation further. Diaby explained that he called the police because he had come to check on the apartment as the landlord but was unable to get through the internal door. Hudson subsequently explained that Lowe was staying in the second-floor apartment, again accused Diaby and Soumare of trying to break in, and said they were trying to evict him. Aguas subsequently asked Hudson if Lowe had a lease for the apartment, and Hudson responded that she did not. Aguas instructed Hudson not to come back to the upstairs apartment.

After this, Diaby informed the Officers that each apartment is rented to someone. Soumare reiterated later that his friend (not Lowe) was renting the second-floor apartment, and Hudson possessed his friends' passports and other documentation. He told the Officers that Hudson had blocked the internal door with something, which was why he needed a screwdriver to open it.

2

The Officers then went downstairs to speak with Lowe, who to this point had remained in the first-floor apartment. While she was preparing to speak with them, Hudson informed them that he placed the additional lock on the interior door because the upstairs tenant had left his belongings unattended. He explained that Diaby had his phone number and could have called to enter the building.

When the Officers spoke with Lowe, she explained that she was staying in the second-floor apartment because the occupant had left for months. When the Officers asked if someone being gone for a year would give her permission to sleep in the upstairs apartment, she responded "No." ECF No. 111 at 24:21–32. Hudson explained that he told her to sleep in that apartment due to the COVID-19 pandemic and Lowe's anxiety and that she was just remaining up there "until the brother came back" and all of his belongings remained in the apartment. *Id.* at 25:00–20. At no point did Lowe or Hudson claim that they had been granted permission to enter the upstairs apartment or that it had been permanently abandoned. The Officers did not ask for the name or contact information of the second-floor tenant, attempt to contact him, or request to see a lease or other written proof of his tenancy.

Hudson further acknowledged that Soumare and Diaby had permission to enter the building so long as they did not enter the first-floor apartment, explaining that he tried to block them from coming in because they bully him. The Officers told Hudson that Diaby had the right to take the interior door off entirely because he is either the landlord or works directly for the landlord, to which Hudson responded that he understood. At no point did Hudson or Lowe claim that Diaby was not the landlord of the property or that Soumare was not a housesitter.

The Officers then asked Lowe to provide her ID, and she responded that it was upstairs. Aguas went upstairs to retrieve Lowe's belongings. When Aguas returned downstairs, he

3

instructed Lowe to "get fully dressed" and to get her belongings from the second-floor apartment. ECF No. 111 at 30:40–57. Hudson again told the Officers that Lowe had been living in the upstairs apartment. Aguas went upstairs and informed Diaby and Soumare that they could arrest Lowe for criminal trespass, but that he could not arrest either Lowe or Hudson for burglary. After this, Diaby and Soumare returned downstairs with a bundle of passports which they alleged belonged to the upstairs tenant.

When Lowe returned downstairs after obtaining her belongings, the Officers handcuffed her. Lowe asked Aguas to get her shoes for her. *Id.* at 40:20-40:30. Aguas entered the first-floor apartment behind Hudson and stood in the doorway for about twenty seconds, asking Hudson to get shoes for Lowe. Neither Lowe nor Hudson objected in any way to this entry. At no other time did either of the Officers enter the first-floor apartment. Five minutes after handcuffing Lowe, the Officers escorted her outdoors. The Officers waited for a female officer to arrive to perform a protective search, allowing Lowe to sit on the edge of the back seat of their car. They then transported Lowe to the precinct. At no point did Lowe state that the Officers caused her any pain.

Ultimately, Lowe was acquitted of criminal trespass at trial. She subsequently brought this case bringing claims under 42 US § 1983 against the Defendant Officers and the City of Chicago for alleged violations of her 4th, 5th, 6th, and 14th Amendment rights.

## **Legal Standard**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "[S]peculation is not enough to create a genuine issue of

fact for the purposes of summary judgment." *Tousis v. Billiot*, 84 F.4th 692, 696 (7th Cir. 2023) (citations omitted). Rather, the parties must support their arguments by citing particular parts of the record, including depositions, documents, declarations, and stipulations. *Horton*, 883 F.3d at 948. The Court views the facts and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.*

## Discussion

For the reasons that follow, the Court grants summary judgment to Defendants on all of Lowe's claims.

### I. False Arrest

Lowe argues that the Officers violated her Fourth Amendment rights by falsely arresting her without probable cause. Defendants respond that they had probable cause to arrest Lowe, and even if they didn't, qualified immunity applies. Because the Court concludes that qualified immunity protects the Officers' determination of probable cause, the Court grants summary judgment to the Officers on Lowe's false arrest claim.

"Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest." *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012). "[P]robable cause does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity—the officer's belief that the arrestee was committing a crime need only be reasonable." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). Even where arrestees dispute that they have committed a crime to an officer, "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018). Thus, so long as the Officers had a reasonable belief that Lowe committed trespass, Lowe's wrongful arrest claim fails. Under Illinois law, "[a] person commits

5

criminal trespass to a residence when, without authority, he or she knowingly enters or remains within any residence . . . that is the dwelling place of another." 720 ILCS § 5/19-4(a)(1).

The doctrine of qualified immunity, however, provides additional protections for the Officers. When qualified immunity is asserted in the context of a Fourth Amendment claim, a plaintiff is required to identify an analogous case where officers who acted similarly were held to have violated the Fourth Amendment. *Wesby*, 583 U.S. 48, 64 (2018) ("Thus, we have stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." (cleaned up)); *Abbott*, 705 F.3d at 723–24 (Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of defeating it either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully.").

Here, Lowe told the Officers she was staying upstairs because the upstairs tenant left for months and acknowledged that someone leaving for months would not mean she could stay in their home. Aguas then asked "so why can you go sleep in this man's apartment for, just because he's gone? He could be gone for a year, does that give you permission to go sleep in that apartment?" ECF No. 111 at 24:20–24:29. Lowe responded "No." *Id.* at 24:29–24:31. And at no time did Lowe or Hudson claim that the second-floor apartment had been permanently abandoned or that Lowe had permission to enter it. Lowe's own statements—in combination with Hudson's admissions that Lowe had been staying in the apartment and that Lowe was only staying there until the tenant returned, the presence of sensitive documents like passports in the unit, and the information provided by Diaby and Soumare[1]—likely establishes probable cause for a charge of

---

[1] Lowe's challenge to the credibility of Soumare and Diaby as witnesses is unpersuasive given the facts outlined in

6

criminal trespass under Illinois law. However, the Court need not decide whether probable cause actually existed because Lowe has cited no analogous case to the facts here where an officer was found to have violated the Fourth Amendment, and qualified immunity would thus protect the Officers even if they lacked actual probable cause. Accordingly, the Court grants the Defendants summary judgment on Lowe's false arrest claim. *Wesby*, 583 U.S. at 64.

## II.    Illegal Search

Lowe alleges in her complaint that entry into the building, the second-floor apartment, and the first-floor apartment without a warrant was an illegal search in violation of the Fourth Amendment. As discussed above, to overcome a defense of qualified immunity in the context of a Fourth Amendment claim, Lowe was required to "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Wesby*, 583 U.S. at 64. As to the entry into the second-floor apartment and the building's common areas, Lowe makes no argument at all as to why the Officer's actions were unlawful and therefore has failed to overcome qualified immunity as to these entries. As such, the Court addresses only the entry into the first-floor apartment in detail.

It is true that Officer Aguas entered the first-floor apartment for about twenty seconds in order to procure shoes for Lowe after Lowe explicitly asked for shoes. ECF No. 111 at 40:28–40:49. No objection was made to this entry by Lowe or Hudson, both of whom observed the entry. *Id.* Lowe fails to identify an analogous case where a Defendant acting similarly was held to have violated the Fourth Amendment and cannot overcome qualified immunity as to the search. In fact, the law that exists seems to indicate the search was lawful. *Harney v. City of Chicago*, 702 F.3d

---

the background section indicating that Hudson never challenged their claims and expressed familiarity with the two throughout the encounter. That said, probable cause would likely exist on these facts putting their statements aside.

916, 926 (7th Cir. 2012) (["T]he fact that neither Harney nor Muldoon objected to the officers' presence in their condominium unit or otherwise indicated that they had not consented to their presence provides additional support that Harney implicitly consented to the officers' entry."); *Gerald M. v. Conneely*, 858 F.2d 378, 384–85 (7th Cir. 1988) (holding that an officer could reasonably assume consent to search where the person answering the door instructed the officer to "wait here," but did not "verbally object," "act astonished," or "physically respond in any way that" expressed disapproval when the officer entered). As such, qualified immunity protects the Officers with regard to Lowe's illegal search claim, and the Court grants summary judgment to the Officers.

### III. Excessive Force

Plaintiff also argues that the Officers used excessive force in effectuating her arrest because "they moved Plaintiff around in the building without a warrant or probable cause" which "endangered the life of Plaintiff and others." ECF No. 7 at 5 (cleaned up). Defendants argue that they used reasonable force, and in the alternative, qualified immunity applies.

"A claim that a law enforcement officer used excessive force during a stop or arrest is analyzed under the Fourth Amendment." *Barnes v. Felix*, 605 U.S. 73, 79 (2025) (citations omitted). Officers are entitled to use at least some level of force to effectuate an arrest. *Graham v. Connor,* 490 U.S. 386, 396 (1989) ("[T]he right to make an arrest . . . carries with it the right to use some degree of physical coercion or threat thereof to effect it."); *Catlin v. City of Wheaton*, 574 F.3d 361, 366 (7th Cir. 2009) ("Because the arrest was valid, the defendants were allowed to use some force in the course of effecting the arrest."). Here, the Court can discern no force greater than the minimum necessary to effectuate the arrest. Lowe was handcuffed with effectively no force and never complained that the Officers caused her pain. While Lowe was moved out of the

building to the squad car, the Court can discern nothing excessive about the force used to effectuate the arrest. *Stainback v. Dixon*, 569 F.3d 767, 769 (7th Cir. 2009) (holding officers' use of force was not unreasonable where a plaintiff was handcuffed between 15 and 20 minutes and alleged that his shoulders hurt twice).

Further, Lowe seems to argue that the Officers used unreasonable force because she is Muslim and the Defendant Officers arrested her in a bathrobe in front of multiple men. Putting aside that the Officers instructed Lowe to "get fully dressed" twice about five minutes prior to handcuffing her, ECF No. 111 at 30:40-55, Plaintiff has cited and the Court has found no authority for the proposition that arresting someone in the state in which they are found constitutes excessive force, let alone an analogous case that could overcome qualified immunity. *Wesby*, 583 U.S. at 64. As such, the Court grants summary judgment to the Officers on Lowe's excessive force claim.

### IV. Sixth and Fourteenth Amendment Claims

Lowe's complaint alleges that the Officers violated her 6th and 14th Amendment rights through the same conduct discussed previously. ECF No. 7 at 7. The Court cannot discern how this conduct implicates either Amendment. As to the Sixth Amendment, the challenged conduct ended prior to the commencement of judicial proceedings. *Garcia v. Hepp*, 65 F.4th 945, 950 (7th Cir. 2023) ("For the last 50 years the Supreme Court has highlighted the firmly established rule that the Sixth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against the accused." (cleaned up)). And Lowe was never convicted, so the Fourteenth Amendment is also not applicable to the conduct subject to this suit. *Wang v. City of Indianapolis*, No. 24-2664, 2025 WL 1000158, at *5 n.4 (7th Cir. Apr. 3, 2025) ("Although Wang invoked the Fourteenth Amendment, that amendment is not implicated unless the criminal proceedings end with a conviction." (citing *Manuel v. City of Joliet*, 580 U.S. 357,

367, 369 n.8 (2017))). And Plaintiff has not explained how the Amendments are implicated despite Defendants' arguments to the contrary. Accordingly, the Court grants summary judgment to the Officers as to these claims.

### V. City of Chicago

Defendants also argue that summary judgment should be granted in favor of the City of Chicago on Lowe's claims because (1) she has not put forward evidence to support a *Monell* claim, (2) because *Monell* liability is not vicarious, and (3) because there is no conduct to indemnify after summary judgment has been granted on the other claims. Lowe's complaint is not clear on her specific allegations against the City, and Lowe does not respond to these arguments in response to Defendants' motion. The Court can discern no evidence supporting a *Monell* claim, *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016), agrees that the City cannot be vicariously liable for the actions of the Officers, *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018), and agrees that there is no conduct remaining to indemnify, *Baskins v. Gilmore*, 2018 WL 4699847, at *12 (N.D. Ill. Sept. 30, 2018). Accordingly, the Court grants summary judgment in favor of the City as to all claims against it.

### Conclusion

For the reasons stated above, the Court grants Defendants' motion for summary judgment [108]. Judgment is entered on behalf of the Defendants. Civil case terminated.

**SO ORDERED.**  ENTERED: **January 30, 2025**

_____
**JORGE L. ALONSO**
**United States District Judge**

10